IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF KANSAS

| | |
|---|---|
| CUSTOMBILT FIREARMS MANUFACTURING, L.L.C., D/B/A THE BULLET HOLE CUSTOMBILT FIREARMS MANUFACTURING,<br><br>Complainant,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF JUSTICE, BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES<br><br>Respondent. | Case No. 2:23-cv-2318 |

## AMENDED COMPLAINT

COMES NOW Petitioners, Custombilt Firearms Manufacturing, LLC, d/b/a The Bullet Hole Custombilt Firearms Manufacturing (hereafter, "Custombilt"), and James Anderson (hereafter, "Anderson"), pursuant to 18 U.S.C. § 923(f)(3) and 27 C.F.R. § 478.78, by and through counsel, and for their complaint against the Respondent, U.S. Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives (hereafter, "ATF"), states as follows:

**INTRODUCTION**

This lawsuit seek redress for a violation of constitutional rights under the second and Fifth amendments. Further, this lawsuit challenges a federal agency's unlawful enforcement of the Gun Control Act of 1968 (the "Act"), codified in 18 U.S.C. § 921 *et seq.*

The Bureau of Alcohol, Tobacco, Firearms and Explosives (the "ATF")

administers and regulates federal firearms licenses ("FFLs"), which grant the holder the right to sell firearms. For decades, the relationship between the ATF and licensees was generally collaborative. The ATF would inspect licensees for compliance with the Act and educate licensees who made inadvertent mistakes with the goal of improving compliance. This helped licensees assist law enforcement efforts, prevent the diversion of firearms from lawful commerce, ensure successful tracing of firearms, and protect the public. Revocation of an FFL was an exceedingly rare action by the ATF and reserved only for the worst actors. For example, in 2013, the ATF only sought revocation of FFLs in 81 out of over 10,500 inspections.

This made sense, as the Act allows license revocations for willful violations. 18 U.S.C. § 923(e). But everything changed in the summer of 2021, when the Biden Administration announced a new policy to enforce the Act against licensees who inadvertently fail to comply. As part of this effort, the Acting Assistant Director of the ATF George Lauder issued a memorandum instructing ATF Special Agents in Charge and Directors of Industry Operations to revoke FFLs for a single violation in many circumstances. Since then, revocations have increased over 500%, as the ATF has effectively written the word "willful" out of the statute by instituting a policy of revoking FFLs for inadvertent paperwork errors.

This new definition of "willful" violates the plain language of the governing statute and puts all law-abiding licensees at risk of revocation for minor and inconsequential paperwork errors that do not pose a threat to public safety, nor result in prohibited possessors obtaining firearms. Complainant Anderson, who operates a gun store in Kansas, which is ran by him personally and holds a federal firearms license for Custombilt. Anderson further holds a federal firearms license in his individual capacity

and name.  The Complainants seek a declaration that the ATF's new enforcement policy violates the Act, a permanent injunction preventing Respondents from ignoring the Act's requirement that violations be willful and reinstatement of the licenses.

## JURISDICTION AND VENUE

1) This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) because this action arises under the United States Constitution;  28 U.S.C. § 1346(a)(2), because this suit constitutes a civil action against an executive department of the United States; and 5 U.S.C. §§ 702 and 706 (providing for judicial review of agency action).

2) This Court has the authority to grant declaratory relief under 28 U.S.C. § 2201 and preliminary and permanent injunctive relief under 28 U.S.C. § 2202.

3) Venue is proper within this judicial district pursuant to 5 U.S.C. § 703 and 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions asserted by Complainants arose within this judicial district.

## PARTIES

4) Complainant James Anderson ("Anderson" or "Complainant") owns and operates Custombilt in Overland Park, Kansas.

5) Complainant Custombilt is a Kansas limited liability company owned by James Anderson and holds a federal firearms license. Complainants assert the claims herein on behalf of both themselves and their customers as explained below.

6) Respondent Bureau of Alcohol, Tobacco, Firearms and Explosives is an agency of the United States and responsible for administrating and enforcing the Gun Control Act.

## THE ACT'S REGULATORY SCHEME.

7) Congress passed the Act in 1968. 18 U.S.C. § 921 *et seq.*

8) The Act sets up a comprehensive scheme for regulating FFLs.

9) The Attorney General has delegated authority to enforce the Act to the ATF. 28 C.F.R. § 0.130.

10) If an applicant fulfills the statutory requirements for a license, it "shall be approved." 18 U.S.C. § 923(d).

11) The Act also gives the Attorney General the statutory authority to revoke licenses. 18 U.S.C. § 923(e).

12) The Act "imposes significant record-keeping obligations upon firearms dealers." *Fairmont Cash Mgmt., LLC v. James*, 858 F.3d 356, 362 (5th Cir. 2017).

13) The Act requires licensees to keep records of their sales through a firearms transaction record, commonly called a Form 4473. 18 U.S.C. § 923(g); 27 C.F.R. § 478.124. Form 4473 requires almost 100 data inputs.

14) Licensees must also contact the national instant criminal background check system ("NICS") before completing a transfer. 18 U.S.C. § 922(t).

15) The ATF inspects licensees for compliance with the Act.

16) Generally, the ATF conducts these inspections less than once per year. *See* 18 U.S.C. § 923(g)(1)(B).

17) The Act only allows revocation when a licensee "willfully" violates a provision of the Act, or a rule prescribed by the Attorney General or fails to have secure gun storage or safety devices. 18 U.S.C. § 923(e).

18) The Act does not define "willfully," but the Fifth Circuit has held it requires that a

licensee know of "his legal obligation and purposefully disregarded or was plainly indifferent to the record-keeping requirements." *Fairmont Cash Mgmt., LLC v. James*, 858 F.3d 356, 362 (5th Cir. 2017).

19) The DOJ and ATF's decades-long revocation policy focused on compliance, not punishment.

20) Prior to 2021, the ATF had an enforcement policy that generally focused on compliance and education. *See, e.g.*, Exhibit A ("ATF industry operations investigators (IOI) conduct inspections of [licensees] to ensure compliance with the

21) law and regulations and to educate licensees on the specific requirements of those laws and regulations.").

22) Specifically, the ATF would "assist with business practices designed to improve compliance with the [Act]."

23) It would only revoke on "rare occasions" when it "encounters a licensee who fails to comply with the laws and regulations and demonstrates a lack of commitment to improving his or her business practices."

24) Further, "revocation actions are seldom initiated until after a licensee has been educated on the requirements" of the Act, and revocations were only for the most serious violations such as failing to account for firearms, failure to verify and document purchaser eligibility, failure to maintain records requisite for successful firearms tracing, and failure to report multiple sales of handguns.

25) In other words, the ATF did not seek revocation for a handful of accidental paperwork errors that may occur among the thousands of transactions a licensee processes.

26) Such an enforcement policy makes intuitive sense, and, more importantly, is in line with the statutory requirement that violations be "willful."

27) The ATF's own prior enforcement orders reflected this willfulness requirement the term willfulness means a purposeful disregard of, a plain indifference to, or reckless disregard of a known legal obligation.

28) ATF statistics also reflect this collaborative approach. In 2020, for example, ATF only successfully sought revocation 40 times out of 5,823 inspections.

29) This is, despite the fact that, in 2020, only 56% percent of inspections resulted in "no violation" reports. The rest (2,546) contained some sort of violation.

30) The far more common response to violations of the Act were a Report of Violations a Warning letter, or a Warning conference.

31) In 2021, licensees did even better, as the ATF sought revocation in only 27 out 6,639 inspections.

32) Respondents change their enforcement policy to a de facto strict liability regime.

33) After the Biden Administration announced its comprehensive strategy to overhaul gun laws in June 2021, the ATF issued a memorandum to all Special Agents in Charge and Directors of Industry Operations that alerted them that single violations should now result in revocation proceedings.

34) The Department of Justice was explicit in announcing it would be changing its enforcement regime: "But for those dealers who willfully break the law and put public safety at risk by violating certain ATF requirements, ATF has and will seek to revoke their licenses pursuant to its zero-tolerance approach, absent exceptional circumstances."

35) Further, the memorandum alerted Special Agents in Charge and Directors of

Industry Operations that there will be a new enforcement order that will "set forth revised procedures for processing FFL inspections that result in findings of violations listed above or other violations that merit revocations."

36) If any of the listed violations are found during the inspection, the ATF will seek revocation "absent extraordinary circumstances."

37) This new Enforcement Policy has resulted in a staggering increase in revocation recommendations.

38) Since announcing this new policy, the ATF has initiated at least 273 revocation proceedings, and likely many more.

39) Upon information and belief, the new Enforcement Policy is to revoke FFLs for inadvertent paperwork errors that do not result in prohibited possessors obtaining firearms.

40) The effect of this new policy is to remove "willfully" from the statute.

41) This results in a strict liability regime, where accidental typos and other minor paperwork errors could cost business owners their livelihoods.

42) Complainants are licensees that operates a gun dealerships in Kansas.

43) In addition to selling firearms, Complainants also offer classes and firearm training.

44) The classes and training include opportunities to obtain Kansas License to Carry a Handgun classes and time in a firing range.

45) The ATF last inspected Custombilt in August of 2018.

46) The ATF issued a report of violations and did not recommend revocation.

47) Instead, as was common practice before the policy change, the report instructed Complainants to take simple corrective actions. For instance, Complainants were

instructed to "ensure that when executing an ATF form 4473, all of the information called for [on the form] is accurately and completely provided[.]"

48) Complainants seek to abide by the Act and have instituted remedial measures in order to comply with the law, including purchasing a software system that more accurately tracks transactions and required background checks.

49) Nevertheless, the new standard applied by the ATF would be virtually impossible to meet when accounting for the volume of transactions that Complainants complete.

50) Specifically, as applied to the last inspection, all four of the types of violations listed in the inspection report would fall under the ATF's new policy regarding falsification of records and would result in a revocation recommendation, despite the fact that none of the violations were actually willful.

51) The ATF would recommend revocation despite the fact that there is no evidence Complainants intended to falsify the records or were indifferent to their duty to fill out the forms accurately.

52) It is unreasonable and inconsistent with the statute to require a licensee to be perfect when seeking to comply with the Act. This is especially true given that Complainant's business includes multiple thousands of transactions a year.

## COUNT I

### AGENCY ACTION VIOLATES THE GUN CONTROL ACT

53) Complainants reallege and incorporate by reference the preceding paragraphs.

54) An agency conclusion regarding the applicability of federal law is final agency action if it marks the end of the decision-making process and all that is left is enforcement.

55) Respondents' intent to apply the Enforcement Policy has been confirmed by their

subsequent actions against licensees in administrative hearings.

56)     Congress's intent is best determined by the words the Act.

57)     Every word of the statute must be given effect.

58)     The Act requires violations to be "willful[]" in order to result in revocation of an FFL.

59)     The Enforcement Policy is inconsistent with the Act because it sweeps in inadvertent violations and does not require violations to be intentional, reckless, or that licensees were indifferent to the Act's requirements.

60)     As a result, Complainants are subject to a regulation that is contrary to law and are entitled to a declaratory judgment and permanent injunction barring Respondents from applying the Enforcement Policy to them and all those similarly situated.

## COUNT II

### AGENCY ACTION VIOLATES COMPLAINANTS' SECOND AMENDMENT RIGHTS

61)     Complainants reallege and incorporate by reference the preceding paragraphs.

62)     Complainants have a right to buy and sell firearms.

63)     As a vendor, Complainants are also able to bring claims on behalf of their customers. *Craig v. Boren*, 429 U.S. 190, 195 (1976).

64)     The right to "possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective." *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011).

65)     If Complainants' FFL is revoked under this unlawful enforcement policy, it will not only infringe on Complainants' rights, but also burden the Second Amendment rights of their customers.

66) The downstream effects of Respondents' Enforcement Policy is to severely limit the availability of lawful gun ownership.

67) Complainants are in the best position to defend the Second Amendment rights of themselves and their customers because they are directly regulated by Respondents.

68) There is a hindrance to individual gun owners' ability to protect their own interests because they rely on licensees to purchase firearms.

69) Reducing the availability of lawful gun ownership burdens citizens' right to individual self-defense. *See N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2133 (2022).

70) The Enforcement Policy will make it harder for citizens to obtain firearms, train with them, and maintain them for the purpose of self-defense.

71) Such a burden is not justified by a handful of paperwork errors, nor is it consistent with the Nation's historical tradition of firearm regulation.

## COUNT III

### AGENCY INTERPRETATION OF THE FEDERAL REGULATION IS A DENIAL OF THE COMPLAINANTS FIFTH AMENDMENT RIGHTS

72) Complainants incorporate the allegations in the foregoing paragraphs as if set forth fully herein.

73) Complainants have a right to buy and sell firearms.

74) If the Respondents are allowed to continue to pursue an enforcement policy using their interpretation of a violation as applied here this would subject the Complainants to the arbitrary exercise of the agency's power.

## EQUITABLE RELIEF FOR AN ONGOING
## VIOLATION OF FEDERAL LAW

75)     Complainants incorporate the allegations in the foregoing paragraphs as if set forth fully herein.

76)     This Court has authority under Article III of the Constitution to issue an injunction against federal officials acting in their official capacities when that injunction will prevent an ongoing violation of federal law or an ongoing violation of constitutional rights.

77)     Respondents or their agents, have since enforced this policy against many licensees.

78)     Upon information and belief, Respondents will take this same unlawful position in the future.

79)     This *de facto* strict liability policy violates the gun control act, the Second Amendment and the Fifth Amendment.

80)     By adopting the Enforcement Policy, Respondents burden the Second Amendment rights of Complainants and their customers.

81)     An actual and substantial controversy exists between Complainants and Respondents as to their legal rights and duties with respect to whether the ATF Enforcement Policy violates Federal Statute and the United States Constitution.

82)     The case is presently justiciable because the Enforcement Policy applies to Complainants as they are subject to possible revocation, which constitutes irreparable harm.

83)     Declaratory relief is therefore appropriate to resolve this controversy.

## PRAYER FOR RELIEF

Pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, it is appropriate and proper

that a declarative judgment be issued by this Court, declaring that Respondents' Enforcement Policy is contrary to federal law.

Furthermore, pursuant to 28 U.S.C. § 2202 and Fed. R. Civ. P. 65, it is appropriate and hereby requested that the Court issue a permanent injunction prohibiting Respondents from enforcing the new policy.

WHEREFORE, Complainants pray for judgment against Respondents and that the Court:

1. Declare that Respondents' Enforcement Policy violates the Gun Control Act, the Administrative Procedures Act, and the U.S. Constitution;

2. Hold unlawful and set aside Respondents' Enforcement Policy;

3. Issue a permanent injunction against the Respondents, as well as all agents, administrators, employees, or other persons acting on behalf of the Respondents, from enforcing the Enforcement Policy;

4. Award Complainants their costs and expenses incurred in bringing this action, including, but not limited to, reasonable attorney fees pursuant to 28 U.S.C. § 2412; and

5. Grant such other and further relief as the Court deems equitable, just, and proper.

Respectfully Submitted,

SUTTON LAW OFFICE, L.L.C.
/s/ Jeffery A. Sutton
Jeffery A. Sutton   (KS #14186/MO #52510)
1106 North 155th Street
Basehor, Kansas  66007
(913) 724-3003  ♦  (913) 724-3005 [fax]
jefferys@jefferysuttonlaw.com
*Attorney for Complainants*